

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00265-CV

———————————————

JIMMIE A. FRANKLIN AND DAVID C. COWDEN, Appellants

V.

JACQUELINE CHATTO, Appellee

On Appeal from County Court at Law No. 2
Tarrant County, Texas
Trial Court No. 2020-004836-2

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellants David C. Cowden and Jimmie A. Franklin sued their former legal client Appellee Jacqueline Chatto for attorney's fees that they contended she owed and refused to pay after they obtained a settlement in a lawsuit where both Cowden and Franklin represented her. Chatto counterclaimed against the lawyers asserting that they had breached the fee contract that the parties had executed in the prior suit; breached the fiduciary duties that they owed to her as her lawyers; and as a result of that breach, caused her mental anguish. Chatto also sought an order that Cowden/Franklin[1] forfeit any fee that they were entitled to under the fee agreement in the prior suit because of their breach of fiduciary duty.

The parties tried the case to a jury, and questions with respect to the various claims were submitted in the jury charge. Applying the jury's answers to the charge questions, the trial court signed a judgment by which Chatto won and the lawyers lost. After considering a motion for judgment notwithstanding the verdict filed by Cowden/Franklin and after granting it in part, the trial court signed an amended final judgment that awarded Chatto damages for mental anguish and attorney's fees for prosecuting her counterclaim. The judgment also ordered that the lawyers have no recovery of the attorney's fees they sought for representing Chatto in the prior suit.

---

[1]We use this shorthand term to jointly refer to the attorneys, and we treat it as plural.

Settlement funds paid in the prior suit had been paid into the registry of the trial court, and the judgment ordered that those funds be released to Chatto.

Cowden/Franklin raise six issues, each of which we overrule. The reasons for our dispositions are summarized as follows:

- We overrule Cowden/Franklin's first issue challenging Chatto's recovery of attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code because Chatto recovered pecuniary value by her breach-of-contract counterclaim.

- Our disposition of the first issue makes it unnecessary to address Cowden/Franklin's second issue, arguing that the trial court erred by awarding attorney's fees based on a cause of action (i.e., breach of fiduciary duty) for which attorney's fees are not recoverable.

- We overrule Cowden/Franklin's third issue challenging the legal sufficiency of the evidence to support Chatto's recovery of damages for mental anguish because there is some evidence that supports the jury's determination that Chatto suffered mental anguish in the past.

- We overrule Cowden/Franklin's fourth issue challenging the legal sufficiency of the evidence supporting a finding that they breached their fiduciary duty to Chatto because there is some evidence to support that finding.

- We overrule Cowden/Franklin's fifth issue challenging the trial court's determination that the attorney's fees that they claimed from representing Chatto in the prior suit should be forfeited because the trial court did not abuse its discretion by concluding that the fees should be forfeited.

- We overrule Cowden/Franklin's sixth issue claiming that the trial court could not order a forfeiture without an oral hearing because Cowden/Franklin never explained what oral testimony they would have presented at a hearing, they had the opportunity to present arguments challenging the forfeiture ruling to the trial court, and they waived any complaint with respect to the trial court's failure to conduct a hearing.

3

We affirm the trial court's amended judgment.

## II. Factual and Procedural Background

### A. Background

The following summarizes the testimony that the jury heard over the course of an eight-day trial.[2]

#### 1. We explain Cowden's prior representations of Chatto and Cowden's representation of Chatto in a suit against her ex-husband.

Cowden had represented Chatto as a lawyer on four occasions prior to the one generating the present litigation. Those prior representations involved Chatto's prior husband and included obtaining a divorce from him and drafting assignments for a portion of benefits that Chatto's ex-husband had received for being held as a hostage in Iraq.

In 2020, Chatto again retained Cowden as her lawyer—this time to sue her ex-husband in state court for various debts, including claims for the portion of the Iraq benefits that he had received that were assigned to her, rent and the cost of repairing damage to a house that Chatto had leased to her ex-husband, payments on a loan to her ex-husband to make mortgage payments, and payments due under the parties' divorce decree. The amount of damages sought was roughly $200,000. Initially, Chatto agreed to pay Cowden an hourly fee to represent her, gave him a $4,000

---

[2]Franklin and Cowden represented themselves in the trial below.

4

retainer, and was billed by Cowden monthly for the work he did on her suit against her ex-husband.

## 2. Chatto's ex-husband removed the suit to federal court, and Cowden suggested that Chatto hire Franklin because of his knowledge of federal procedure.

The suit against Chatto's ex-husband was filed in a Texas state court, and a temporary restraining order was entered to prevent him from dissipating funds that were in his possession. Chatto's ex-husband responded to the suit by removing it to federal court. By the time the removal occurred, Chatto had concluded that she could not afford to pay an hourly fee for representation and had begun to search for a lawyer who would accept a contingency fee. Also, at the time of the removal, Cowden told Chatto that he was not comfortable handling a suit in federal court and suggested bringing on his friend Franklin as additional counsel because of his knowledge of federal procedure.

Chatto testified that initially Cowden told her that he and Franklin would handle the matter for a 40% contingency fee—an amount that she would not agree to. According to Chatto, while she was looking for another lawyer, Cowden called and said that he and Franklin would represent her for a 20% contingency fee.

## 3. The parties executed a contingency-fee agreement, which later sparked controversies over what the parties had discussed at the time it was executed.

Cowden, Franklin, and Chatto met to discuss the details of the representation. Two events from the meeting are pivotal: what was said about the Contingent Fee

5

Agreement that was executed (Fee Agreement) and an alleged discussion about Chatto's criminal history.

### a. The parties signed a written Fee Agreement.

One paragraph of the Fee Agreement became a sticking point in the parties' relationship. The fee provision of the Fee Agreement provided that

> Client agrees to pay Attorneys as fees for such representation 20% of any gross recovery before the action is filed; 20% of any gross recovery after the action is filed[] but before the commencement of trial; 25% of any gross recovery after commencement of trial; and 30% of any gross recovery after the filing of any appeal by any party. This percentage applies only to the Client's award or settlement of her contractual damages. Additionally, the Attorneys shall retain 100% of the hourly billed attorneys' fees awarded by the [c]ourt at any time[] or the hourly billed attorneys' fees that the Defendant agrees to pay pursuant to the terms of any settlement agreement.

As explained below, the controversy primarily centers on whether Cowden/Franklin were entitled to fees under the provision dealing with fees awarded "by the court" or "that the Defendant agrees to pay pursuant to the terms of any settlement agreement."

### b. Chatto explained her understanding of the Fee Agreement.

Chatto claimed that Cowden had explained the proposed fee structure of the Fee Agreement to her as follows:

> I said so I would only pay 20 percent? He said yes, you only pay 20 percent. I said what about these other lines? He explained to me that anything awarded by the Defendant, that [her ex-husband] would pay -- would only pay 20 percent, and if anything the [c]ourt awards them, then

6

they would keep that.  I said that's fine as long as I only pay 20 percent. And they -- that's how they they [sic] explained it.

Chatto testified that she had signed the Fee Agreement on the basis of her understanding that she would not have an obligation to pay her attorneys more than a 20% contingency fee and out-of-pocket expenses.

### c. Cowden explained the understanding he conveyed to Chatto of the Fee Agreement.

At trial, Cowden claimed that he had given Chatto a different explanation of the Fee Agreement.  Cowden testified that he had told Chatto that the contract had a bifurcated fee.  He disputed that the contract terms limited attorney's fees to a 20% contingency fee:

> Because the contract goes on[ ]to say the percentage only applies to contractual damages.  There was no indication in the settlement agreement as to what portion, if any, was contractual damages.  And it says, additionally, we'd be entitled to our hourly billed rate as awarded by the [c]ourt or that the Defendant agrees to pay pursuant to the terms of any settlement agreement.

Cowden claimed that he had fully explained the Fee Agreement to Chatto before it was signed; that he had discussed the advantages of the contract with Chatto; and that "she knew that if the case settled, depending -- that then we were going to have to agree on the amount of the billable attorney hours."  He continued, "She wanted the percentage reduced to 20 so, you know, in the give and take of the agreement, she agreed to pay the hourly fee as either awarded by the [c]ourt or as we agreed on later on once the case was resolved."

Chatto was emphatic that this explanation was never given when she was asked about the explanation that Cowden had allegedly given her of the fee provision:

> Q. Do you remember David Cowden telling -- saying to you, with me in your presence -- we're all three together -- all right, Jackie. This is the contract. It's got the contingency fee part of it, and then there's an hourly part. And all three of us have to agree, when that money day comes, as to the hourly part based on the contract damages claim and all that. We all have to agree. Do you remember that conversation and that explanation by Mr. Cowden?
>
> A. That did not happen.

### d. The parties disputed what was said regarding Chatto's criminal history.

The other bone of contention resulting from the initial meeting was whether Chatto was forthright when questioned by Franklin about her criminal history. Franklin knew from a public-records search that Chatto had been charged and had pleaded guilty to embezzling $40,000 from Bell Helicopter about ten years earlier. Cowden and Franklin were not troubled by the revelation of the Bell matter because they believed that its age made evidence of it inadmissible. Franklin also claimed that he had asked Chatto if she had been charged with a crime such as shoplifting or passing bad checks and said that she had denied that she had. Franklin stated that he would not have taken on Chatto as a client had he known of an additional criminal charge that he claims was not disclosed at the meeting. Chatto denied that Franklin asked her questions about her other criminal charges at their first meeting.

But the parties do agree that they discussed Chatto's criminal history in a phone call that occurred a few days after the initial meeting—a call allegedly prompted after counsel for Chatto's ex-husband intimated to Cowden and Franklin that "there were other issues with [Chatto]." Chatto claimed that during the call, she disclosed that she had also been charged with and had pleaded guilty to shoplifting; Chatto's present husband who heard her statements during the call confirmed that he had heard her make that disclosure. Cowden and Franklin denied that she had told them of the shoplifting matter during the call. An email that Chatto sent after the call explained in detail the Bell embezzlement matter but did not mention shoplifting. As discussed below, Cowden and Franklin claimed that the alleged failure of Chatto to disclose the shoplifting matter blindsided them when it was eventually disclosed and that the failure to disclose that matter was an act of deception by Chatto. Chatto portrayed Cowden and Franklin as later using the criminal charges—which they claimed that she had not disclosed but which she claimed that she had—as leverage to extract a larger fee from her.[3]

---

[3]There were also vague allegations that Chatto had forged a document in conjunction with filing a claim against the Iraq hostage fund on behalf of her ex-husband. The jury heard that Chatto had denied the allegation and that Franklin had reviewed email communications with respect to it and had "found nothing." The record is very confusing on this issue, and it was not the act that formed the basis of Cowden/Franklin's fraud claim against Chatto.

**4. We set forth how the suit against Chatto's ex-husband proceeded after it was removed to federal court, the mediation between the parties to that suit, and the controversies between Chatto and Cowden/Franklin about what occurred at the mediation.**

After the call just discussed, litigation proceeded in federal court with Franklin taking the roles of lead counsel and laboring oar in performing the legal tasks required. Franklin drafted a request that the federal court sequester funds in Chatto's ex-husband's hands to replace the state court's temporary restraining order, which was abrogated when the case was removed to federal court. The federal court denied that request. Franklin also worked with opposing counsel to comply with the federal court's order to prepare a joint report to the court, to give input for the federal court to prepare a scheduling order, and to prepare initial disclosures required by the federal court. Franklin also prepared a mediation statement when the parties scheduled a mediation.

**a. The lawyers claim that they only became aware of the full extent of Chatto's criminal history because of revelations at the mediation.**

Chatto's suit against her ex-husband was mediated and settled less than two months after the date that the Fee Agreement was signed and after the case was removed to federal court. At the mediation and its immediate aftermath, the relationship between Chatto and Cowden/Franklin broke down, with the lawyers claiming that they had discovered that Chatto had not been forthright with them about her criminal history and that she had reneged on representations that she had

10

made during the mediation about how to structure their fee should the case settle. According to Chatto, the relationship broke down because Cowden/Franklin demanded a fee not provided for in the Fee Agreement and misrepresented to her that she could not settle without their authorization.

Franklin claimed that he first learned of additional criminal matters involving Chatto during the mediation when Chatto's ex-husband's counsel authorized the mediator to disclose counsel's knowledge that Chatto had additional criminal charges besides the Bell matter. Franklin stated that he and Cowden were blindsided by the revelation because they did not know of "the second crime of the theft" before the mediation. Cowden and Franklin claimed that they did not fully understand the shoplifting matter until after the mediation when Cowden obtained court documents revealing its nature. The shoplifting matter became a focus of the litigation below because the fraud claim made by Cowden and Franklin in the present litigation— which they leveraged to argue that the Fee Agreement should be invalidated—was predicated on Chatto's failure to disclose the shoplifting matter.

> **b.    During the mediation, a controversy arose that centered on a discussion of the fee that the lawyers would receive should the case settle for $175,000.**

With respect to Chatto's reneging on promises made during the mediation, Cowden and Franklin described how Chatto had agreed to a division of settlement funds should the case settle for $175,000. The structure discussed was that "she would accept $120,000 as her share, less the 20 percent called for under the terms of

11

our agreement[,] which would have netted her $96,000 exclusive of costs [that], of course, would have been deducted from the gross settlement amount." Specifically, Cowden testified that Chatto would accept $120,000 as her "contractual damages" from which the 20% contingency fee would be deducted and that the remaining $55,000 "would be the billed attorney fees." Chatto did not deny that this discussion occurred or that she may have agreed to the proposal, but the parties agree that the case did not settle for $175,000.

Though Chatto testified that she had agreed to the proposal, she also testified that her agreement was based on her lawyers' telling her that she could not settle without their consent:

> Keep in mind, I was under so much pressure from [Franklin (who was questioning her)] and Mr. Cowden[] because you were saying that if you don't agree to our demand, I will not settle the case for you. And you said that all three of us have to agree to settle the case. So at that time, I probably did agree, but I thought that was the only option I had.

### c. We set forth the representations allegedly made by the lawyers at the mediation that they controlled the decision to settle.

With respect to the lawyers' claiming that the case could not settle unless they agreed, Chatto testified that both Cowden and Franklin told her this. For example, Chatto testified that at one point in the mediation, the following occurred:

Q. What did they tell you?

A. Well, after Mr. Franklin said that he want[ed] more money, then Mr. Cowden started saying that if we -- if they accept our $175,000 offer, we will give you this and we will do that and stuff. I said Mr.

12

Cowden, that's a lot of money.  Then Mr. Franklin said if you don't accept our offer, I will not settle the case.  He said I'm not settling the case and you won't get anything.

Q.  So did you understand that he was telling you [that] you couldn't settle the case without hi[s] agreeing to it?

A.  That was later.  He said if you don't accept our agreement, I won't settle the case, and he said we -- all three of us have to agree.

Q.  You say that was later when he said that?

A.  Yes.

Q.  Was it still during the mediation?

A.  Yes.

Q.  Did you know at that moment or at any time during the medi[]ation, that as the client, you [could] tell the lawyers that you wanted to settle your case and you could make that decision yourself?

A.  No, I did not know that.  I believed what he told [me] was correct.

Franklin denied making the statement and acknowledged that it is improper for a lawyer to claim that he had to agree to a settlement as well as the client.  Cowden could not recall whether the statement was made.  Cowden testified as follows:

Q.  Did either you or Mr. Franklin ever tell her, you can't settle your case without our permission because we're the attorneys?

A.  I don't remember that conversation.

Q.  If it happened, you don't remember it one way or another; is that right what you're saying?

A.  I don't remember that.

13

. . . .

Q. (BY [Chatto's trial attorney]) So what you're saying is, you don't remember if you or Mr. Franklin told M[r]s. Chatto, you can't [settle] without our agreement. We're the lawyers. You don't remember that being said, not being said, you just have no recollection, one way or another, to agree that it was said or disagree that it was not said in your office?

A. I don't have a recollection of that one way or the other.

### d. Chatto expressed her desire to settle at the mediation.

The mediation ended with Chatto's ex-husband offering to settle for $110,000. The parties agree that at this point Chatto wanted to put an end to the case, that the next offer made should be accepted, and that Chatto stated that the lawyers would receive a 20% contingency fee.

### 5. We set forth the settlement reached with Chatto's ex-husband and the conflict that arose between Chatto and Cowden/Franklin about what fee the lawyers were entitled to.

No additional settlement offers were made at the mediation. However, at the end of the day that the mediation occurred or the next day, the mediator made a proposal to settle the case for $142,500. Chatto and her present husband met with Cowden and Franklin to discuss the offer and, according to Franklin, for the lawyers to investigate what he contended was the late revelation of the shoplifting matter. Before the meeting, Cowden claimed that he had conducted his investigation and had obtained the criminal case file regarding the shoplifting matter. When they met, Franklin claimed that Chatto apologized for not revealing the "second theft."

14

At the meeting regarding the mediator's settlement proposal, Chatto portrayed Cowden and Franklin as arguing that their prior discussion of a fee based on a $175,000 settlement should be the basis for their fee. Chatto claimed that her husband rebuffed that contention by stating that the case did not settle for $175,000. Chatto contended that she remained willing to pay the 20% contingency fee on the total settlement amount that she understood the Fee Agreement required. She also testified that she had learned through her own research after the mediation that it was solely her decision and not the lawyers' decision regarding whether to settle. The parties ended the meeting with Chatto's giving instructions to settle the case for the $142,500 proposed by the mediator and standing firm that the only fee that she owed was a 20% contingency of that amount—the fee that she understood was required by the Fee Agreement.

The lawyers followed Chatto's instructions and accepted the mediator's proposal as did the other side. However, Franklin acknowledged trying to have both the mediator and opposing counsel allocate a portion of the settlement to attorney's fees; both refused to do this. Franklin described his purpose in asking for an allocation as follows:

> [Cowden] and I were more focused on trying to get [Chatto's ex-husband] and his lawyer to commit to what their version of M[r]s. Chatto's contract damages were[ ] because that's the key to the [Fee Agreement] -- attorney fees calculation. So no. We were wanting to see what it was that they would tell us [regarding] what [Chatto's ex-husband] was actually paying for as far as the contract damages.

15

Neither Cowden nor Franklin testified that this effort was authorized by Chatto. It appears that it was not authorized; Cowden testified as follows:

> Q. . . . Now, the mediator's proposal is made and she tells us to accept it. At that point in time, when did she authorize us, at that point in time, as we sit here right now, authorize us to agree with the Defendant about attorney fees?
>
> A. Never.

Both the dismissal documents filed with the federal court and the settlement agreement executed with Chatto's ex-husband did not allocate any of the recovery to attorney's fees and instead stated that each party was responsible for his or her own attorney's fees. Cowden also admitted that no fees were ever awarded by a court.

Once the settlement documents were finalized, settlement funds were paid and placed in Cowden's trust account. Franklin testified that Chatto remained steadfast in the position that the Fee Agreement required the payment of only a 20% contingency fee from the total settlement amount—a position that he claimed to be clueless to understand. He stated that Chatto quit responding to their communications. However, the record contains a series of emails that appear to outline Cowden's claim that a fee should be calculated on percentages based on the agreement allegedly worked out if the case had settled for $175,000 and why he thought the proposal that he was making was fair. Chatto responded that she would not agree to that arrangement and reiterated her view that the Fee Agreement required only a 20% contingency fee. She stated, "You advised me early on that the likely outcome of this

suit would be a mediated settlement, and per the contract that means attorney[']s fees would be 20% of the settlement plus expenses."

The day after Chatto sent the last email in this series, Cowden sent a letter drafted by Franklin to Chatto that disavowed the continued validity of the Fee Agreement and stated,

> As you are aware, as to the current attorney[-]fee dispute between us, (arising out of the total $142,500.00 settlement funds collected and currently being held in Cowden's IOLTA bank account), *Cowden and Franklin believe that the written attorney[-]fee agreement that we all signed is no longer valid[] and that Cowden and Franklin are entitled to be paid attorney's fees out of the settlement funds for their actual hours of attorney time worked multiplied by their respective reasonable and customary hourly rate.* Texas law calls this method of attorney fee[s] payment and calculation as "quantum meruit." [Emphasis added.]

The letter attached invoices from Cowden for a total fee owed to him of approximately $13,000 and to Franklin of $42,000. The letter went on to propose that Cowden and Franklin would receive a fee that represented 20% of the settlement funds, that an additional approximately $42,000 would be held in Cowden's trust account pending later agreement or court order, and that approximately $72,000 would be disbursed to Chatto. The letter threatened that the attorneys would file suit against Chatto in three days and that if suit were filed, Cowden would retain the entire settlement amount "until the [c]ourt order[ed] otherwise."

17

### 6. Cowden/Franklin sue Chatto but make additional settlement offers.

Cowden and Franklin did not wait for the three-day period to expire and instead sued Chatto two days after the date of the letter. On the same day as filing suit, Cowden sent Chatto a letter enclosing a check for $71,990.01, which the letter said "represent[ed her] share of the settlement proceeds that is not in dispute." The check bore the notation "settlement" and was never cashed. Shortly after suit was filed, Cowden and Franklin offered to settle for a total fee of $50,000. Eventually, the settlement funds held by Cowden (less a fee paid to the mediator) were placed in the trial court's registry.

### B. Procedural history in the current suit

### 1. We set forth the claims pleaded by the parties.

In their live petition, Cowden and Franklin asserted against Chatto various causes of action, which included the following:

- A claim for breach of contract based on the allegation that the parties "understood and agreed that [the Fee Agreement] called for Cowden and Franklin to be paid their respective attorney's fees by both a 20% contingency and by an hourly rate based upon each attorney's reasonable hourly rate multiplied by the number of hours worked on the federal court case";

- A claim that the percentages discussed at the mediation of how a fee would be allocated based on a settlement offer of $175,000 constituted an oral modification of the Fee Agreement;

- A claim that the percentages based on a hypothetical $175,000 settlement offer constituted an implied contract;

18

- A claim that Chatto fraudulently induced Cowden and Franklin to enter into the Fee Agreement;

- A claim that Chatto committed fraud by not disclosing the shoplifting matter;

- A claim that Chatto's fraudulent acts rendered the Fee Agreement void; and

- A claim that Cowden and Franklin could recover fees from Chatto under a quantum meruit theory.[4]

The petition sought damages of $13,509.99 for Cowden's fees and $42,000 for Franklin's fees. Franklin also sought fees incurred in the prosecution of the suit filed against Chatto and on appeal.

Chatto filed a counterclaim. The live counterclaim asserted that (1) Chatto should recover her costs and expenses because the suit was filed in bad faith, (2) Cowden and Franklin had breached their contract with Chatto and sought attorney's fees on that claim, (3) Cowden and Franklin breached their fiduciary duty to Chatto, and (4) Chatto was entitled to a declaratory judgment. Chatto also sought to recover damages for mental anguish based on her claim of breach of fiduciary duty.

---

[4]Cowden/Franklin's briefs make one passing mention of the quantum meruit claim but predicate no claim of error on it. Further, as Chatto points out, "[T]he finding of a valid contract governing the parties' dispute renders the questions on quantum meruit immaterial. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)." Thus, as explained more below, the dearth of discussion and Chatto's emphasis on the jury's findings make the claim immaterial, and thus it is unnecessary to discuss the claim any further.

19

Chatto later filed a supplemental counterclaim. The supplemental counterclaim pleaded that should the jury find a breach of fiduciary duty by Cowden or Franklin, the trial court should then determine whether a "proper and appropriate" portion of any fee awarded to them for their representation of Chatto in the suit against her ex-husband should be forfeited.

## 2. The jury returned a verdict in Chatto's favor.

The trial court submitted a charge with eighteen questions to the jury. The jury's answers may be summarized as follows:

- Chatto and Cowden/Franklin agreed to the fee provision of the Fee Agreement;

- Chatto and Cowden/Franklin failed to comply with the Fee Agreement;

- Chatto's failure to comply with the Fee Agreement *did not* harm Cowden/Franklin;

- Cowden/Franklin's failure to comply with the Fee Agreement *did* harm Chatto;

- Cowden/Franklin failed to comply with the Fee Agreement first;

- The fee due Cowden/Franklin under the fee provision of the Fee Agreement was $28,500—20% of the $142,500 settlement;

- Cowden/Franklin performed compensable work for Chatto;

- The value of the compensable work performed for Chatto was $13,509.99 for Cowden and $14,990.01 for Franklin, i.e., a total of $28,500 for both;

- Chatto did not commit fraud against Cowden/Franklin;

20

- Franklin is not entitled to recover attorney's fees for his work in the suit against Chatto;

- Cowden/Franklin committed a breach of fiduciary duty that caused harm and damage to Chatto;

- Chatto's damages for Franklin's breach of fiduciary duty were $24,000 for mental anguish suffered by Chatto in the past;

- Chatto's damages for Cowden's breach of fiduciary duty were $12,000 for mental anguish suffered by Chatto in the past; and

- The reasonable fee for the necessary services provided in the trial court by Chatto's attorney in the suit below was $130,000; no fees were awarded on appeal.

> **3.** **We explain the first judgment signed by the trial court and the amended judgment signed in response to Cowden/Franklin's post-judgment motion.**

The trial court initially signed a final judgment that provided the following relief:

- Cowden/Franklin were entitled to no affirmative recovery against Chatto;

- Chatto recovered the respective mental-anguish awards made by the jury against Cowden and Franklin;

- Chatto recovered the jury's $130,000 attorney's fee award jointly and severally against Cowden/Franklin; and

- Funds held in the registry of the court were to be paid to Chatto.

Cowden/Franklin filed an amended motion to disregard jury findings (the JNOV) and to correct and reform the judgment. In general, the JNOV attacked

21

various jury findings and awards in the judgment. A central focus of the JNOV was its six-page discussion regarding why it was improper for the trial court to order that Cowden/Franklin forfeit any fee with respect to the representation of Chatto in the suit against her ex-husband. The JNOV also challenged a finding in the original judgment that Cowden/Franklin's suit was brought in bad faith. Cowden/Franklin later filed an additional "response" that argued among other things that the trial court could not enter a bad-faith finding without having had a hearing on that issue.

The trial court granted the JNOV filed by Cowden/Franklin only to the extent that it removed the bad-faith finding from the judgment. The trial court signed an amended judgment that removed the bad-faith finding but still included a stated basis for its judgment as follows:

> [P]ursuant to [the jury's] verdict, and also pursuant to applicable law, and finding that Ja[c]queline Chatto as defendant and counter-claimant has prevailed in this case, and that Plaintiffs and counter-claim defendants Franklin and Cowden were first to breach a contract/agreement with Chatto and each did breach their fiduciary duties to Chatto, and this [c]ourt now adopting all findings as contained in the jury['s] verdict; and finding that by virtue of breach of fiduciary duty neither Franklin nor Cowden is entitled to recover any attorney fee from Chatto in connection with the suit Chatto brought against her former husband; and in conformity with controlling law and with the jury verdict in this case; IT IS, THEREFORE,
>
> ORDERED . . . .

The amended judgment carried forward all the relief specified in the trial court's original judgment. Cowden/Franklin filed no further post-judgment motions and perfected an appeal.

22

### III. Analysis

**A.**     **Issue One—Cowden/Franklin's challenge to Chatto's recovery of attorney's fees**

**1.**     **We hold that Chatto is entitled to recover attorney's fees for prosecuting her counterclaim under Chapter 38 of the Texas Civil Practice and Remedies Code because she recovered value by the prosecution of her counterclaim.**

In their first issue, Cowden/Franklin challenge the trial court's award of Chatto's attorney's fees of $130,000. Their argument focuses on the principle that a party who does not recover damages on a breach-of-contract claim or who only successfully defends against an opponent's breach-of-contract claim is not entitled to recover attorney's fees under the general Texas attorney's fees statute found in Chapter 38 of the Texas Civil Practice and Remedies Code. Chatto cites to a line of cases that permits a recovery of fees should a party obtain something of value by a breach-of-contract claim, even if the jury did not award damages. Here, the jury made a finding that there was a prior breach of the Fee Agreement, and that finding was relied on by the trial court to deny Cowden/Franklin the contingency fee provided in that contract. From this, Chatto obtained a larger amount of the money in the registry of the court than she would otherwise have been awarded. This is something of value in a specific amount and supports the trial court's attorney's fee award.

**2. We set forth the judgment's provisions with respect to the recovery of fees by Chatto and why the judgment relieved Chatto of an obligation to pay Cowden/Franklin the contingency fee provided for by the Fee Agreement.**

As we outlined above, the jury found that Cowden/Franklin "failed to comply with the [Fee Agreement] first." In their reply brief, Cowden/Franklin argue that the trial court's judgment did not rely on this finding as a basis to rule that they were not entitled to the contingency fee but that relief was solely based on a forfeiture resulting from a breach-of-fiduciary-duty finding. However, that contention is incorrect. The judgment specifies that

> pursuant to [the jury verdict], *and* also pursuant to applicable law, *and* finding that Ja[c]queline Chatto as defendant and counter-claimant has prevailed in this case, *and* that Plaintiffs and counter-claim defendants Franklin and Cowden were first to breach a contract/agreement with Chatto *and* each did breach their fiduciary duties to Chatto, *and* this [c]ourt now adopting all findings as contained in the jury['s] verdict; *and* finding that by virtue of breach of fiduciary duty neither Franklin nor Cowden is entitled to recover any attorney fee from Chatto in connection with the suit Chatto brought against her former husband[, and then the trial court ordered specific relief.] [Emphasis added.]

Though not a model of clarity, the judgment provided that Cowden/Franklin are not entitled to the contingency fees on two bases—(1) the jury's verdict, which included a finding that Cowden/Franklin had breached the contract first, and (2) the trial court's conclusion that their breach of fiduciary duty warrants forfeiture.

As a general proposition, "[i]t is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v.*

24

*Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *see also Kim v. Sanchez*, No. 02-12-00465-CV, 2014 WL 4364170, at *2 (Tex. App.—Fort Worth Sept. 4, 2014, pet. denied) (mem. op.) (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)). In their opening brief, Cowden/Franklin did not attack the jury's finding that they had failed to comply first; rather, they waited until their reply brief to raise an argument that the finding would not support the trial court's conclusion rendering them unable to collect the contingency fee provided in the Fee Agreement. Their argument comes too late. *See Sister Initiative, LLC v. Broughton Maint. Ass'n, Inc.*, No. 02-19-00102-CV, 2020 WL 726785, at *17 n.7 (Tex. App.—Fort Worth Feb. 13, 2020, pet. denied) (mem. op.) (holding that a contention raised for the first time in a reply brief is waived).

In essence, the prior-breach finding entitled Chatto to a larger share of the funds held in the registry of the court that represented the settlement paid by her ex-husband in the prior litigation. Thus, the judgment provided Chatto a tangible recovery because the specific sum that Cowden/Franklin claimed as their fee was now awarded to Chatto.

### 3. We conclude that the judgment entitled Chatto to recover attorney's fees because she recovered value by her counterclaim.

We begin our analysis by setting forth the premises that the trial court used Cowden/Franklin's prior breach as a basis to conclude that they were not entitled to collect a contingency fee and that this conclusion is valid because it is unchallenged.

25

With those premises in place, the question becomes whether Chatto's recovery supports an award of attorney's fees under the general Texas attorney's fees statute. At some length, Cowden/Franklin argue that the American Rule does not permit the recovery of attorney's fees unless provided for by contract or statute. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 486 (Tex. 2019). We disagree with the premise that a Texas statute does not cover Chatto's recovery.

The relevant section of the general attorney's fees statute governing the recovery of fees for a breach of contract requires two things:

> Section 38.001(8) provides that a party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code [Ann.] § 38.001(8). To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable[] and (2) recover damages.

*Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). Cowden/Franklin argue that Chatto never pleaded for, put on evidence of, or obtained a jury award of any damages for her breach-of-contract counterclaim.[5]

Chatto counters by citing cases holding that "[a] 'valid claim' under [S]ection 38.001(8) is not limited to a claim for monetary damages. Instead, it includes any claims for which the party recovers 'at least something of value.'" *Kleburg Cnty. v. URI, Inc.*, 540 S.W.3d 597, 611 (Tex. App.—Corpus Christi–Edinburg 2016) (citation

---

[5]Chatto also argues that the trial court rendered a declaratory judgment that would support an award of attorney's fees. Our holding makes it unnecessary to reach that argument. *See* Tex. R. App. P. 47.1.

omitted), *rev'd on other grounds*, 543 S.W.3d 755 (Tex. 2018).[6]  This principle has been most often applied to situations when there is no recovery of damages on a breach claim, but other relief is granted, such as specific performance or an injunction.  The First Court of Appeals has done an admirable job of summarizing the split of authority on this question:

> The courts of appeals are split on the issue of whether recovery of monetary damages is necessary to support a claim for attorney's fees under Chapter 38 or whether prevailing on a breach-of-contract claim and recovering relief by an order of specific performance of the contract is sufficient to support such an award.  The Austin and Texarkana courts have concluded that attorneys' fees under Chapter 38 may not be awarded to the prevailing party in a breach-of-contract case absent a monetary recovery.  *Haubold v. Med*[.] *Carbon* [*Rsch.*] *Inst.*, [No. 03-11-00115-CV,] 2014 WL 1018008[,] at *5–6 (Tex. App.—Austin Mar[.] 14, 2014, no pet.) (mem. op.) (concluding that specific performance in enforcing Rule 11 agreement was not a recovery of actual damages and thus attorney's fees incurred in enforcing the agreement were not recoverable); *Berg v. Wilson*, 353 S.W.3d 166, 182 (Tex. App.—Texarkana 2011, pet. denied) (concluding that "because [appellee] did not recover actual damages, she was not entitled to recover attorneys' fees on her [Rule 11] breach[-]of[-]contract claim," but affirming award on alternative basis).

> In contrast, this [c]ourt has held that relief in the form of specific performance of the contract is a recovery that remedies actual damage for a valid claim.  *See Albataineh v. Eshtehardi*, [No. 01-12-00671-CV,] 2013 WL 1858864, at *1–2 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet.) (mem. op.) (holding that "an award of specific performance of the parties' settlement and of the restrictive covenant in the special warranty deed" supported an award of Chapter 38 attorneys' fees and rejecting the argument that money damages in addition to relief by specific performance were required); *see also* Tex. Civ. Prac. & Rem.

---

[6]We apply a de novo standard of review to this question.  The availability of attorney's fees under a particular statute is a question of law for the court.  *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (op. on reh'g).

Code [Ann.] § 38.005 ("This chapter shall be liberally construed to promote its underlying purposes.").

Other courts of appeals have likewise recognized that a "valid claim" under [S]ection 38.001(8) is not limited to a claim for monetary damages[] but also encompasses specific performance of the agreement to avoid actual damage. *Woody v. J. Black's, L.P.*, [No. 07-12-00192-CV,] 2013 WL 5744359, at *6 (Tex. App.—Amarillo Oct. 1[8], 2013, pet. denied) (mem. op.) (recognizing that an "injunction enforcing specific performance of a contract is something of value" sufficient to support Chapter 38 attorneys' fees and rejecting argument that an award of monetary damages were required); *Rasmusson v. LBC PetroUnited, Inc.*, 124 S.W.3d 283, 287 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that award of specific performance of arbitration agreement permitted recovery of Chapter 38 attorneys' fees and rejecting argument that monetary damages were required); *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 474 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (interpreting Chapter 38 to authorize an award of attorneys' fees when a party "successfully prosecutes a claim founded on . . . written contracts[ ]").

These cases reflect the courts' recognition that an injunction to enforce specific performance under a contract is of pecuniary value if that enforcement prevents actual loss to the aggrieved party. *Butler*[ *v. Arrow Mirror & Glass, Inc.*], 51 S.W.3d [787,] 797 [(Tex. App.—Houston [1st Dist.] 2001, no pet.)] (quoting *Rodgers v. RAB Invs., Ltd.*, 816 S.W.2d 543, 551 (Tex. App.—Dallas 1991, no writ)[, and] recognizing that injunction enforcing covenant not to compete was something of value)[]. This meaningful recovery of value in these cases renders them distinguishable from cases denying recovery of attorneys' fees because the prevailing party had no recovery at all (or at most a nominal recovery) for breach of the underlying contract. *See MBM Fin. Corp.*[ *v. Woodlands Operating Co., L.P.*,] 292 S.W.3d [660,] 663 [(Tex. 2009)] ("[T]he [appellees'] fee award cannot be affirmed based on Chapter 38" because they "can recover neither actual nor nominal damages."); *Green* [*Int'l*], 951 S.W.2d [at] 390 (reversing attorneys' fees award because although jury found that contract was breached, it awarded zero damages for breach).

28

*Boyaki v. John M. O'Quinn & Assocs., PLLC*, No. 01-12-00984-CV, 2014 WL 4855021, at *13–14 (Tex. App.—Houston [1st Dist.] Sept. 30, 2014, pet. denied) (mem. op.); *see also Palavan v. McCulley*, 498 S.W.3d 134, 143 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (following *Boyaki*); *Felix v. Prosperity Bank*, No. 01-14-00997-CV, 2015 WL 9242048, at *3 (Tex. App.—Houston [1st Dist.] Dec. 17, 2015, no pet.) (mem. op.) (following *Boyaki*'s holding that "a judgment requiring specific performance of a material contract right is an award of value that will support an award of attorney's fees under Chapter 38 in the absence of a monetary damage award"); *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at *14 (Tex. App.—Dallas Aug. 28, 2017, pet. denied) (mem. op.) ("Further, courts have recognized that a 'valid claim' under [S]ection 38.001 of the Texas Civil Practices and Remedies Code is not limited to a claim for monetary damages[] but also encompasses specific performance of the agreement to avoid actual damages.").

We agree with the majority line of cases that the recovery of something of value supports recovery under Section 38.001; to restrict the language of "the amount of a valid claim" to only those situations where there is a specific award of damages unduly cabins the language used. By Chatto's theory of prior breach, she recovered something of value—the value of a specific amount. Her theory allowed her to obtain the amount of the funds in the registry of the court that otherwise would have been awarded to Cowden/Franklin. As Chatto's brief expresses the matter, "[t]he

29

take-nothing judgment based on the jury's findings afforded Chatto 'relief from impending actual damage' in the form of paying the lawyers."

**4. We set forth why we reject Cowden/Franklin's challenges to Chatto's recovery of attorney's fees under Chapter 38.**

When confronted with Chatto's theory that she is entitled to recover fees under Chapter 38, Cowden/Franklin's reply brief offers a number of arguments in an attempt to rebut that theory; none of which are persuasive:

- Cowden/Franklin contend that the trial court concluded only that they were not entitled to their fees based on a breach of fiduciary duty. We have already discussed and rejected that argument.

- Cowden/Franklin state that Chatto cites no supreme court case to support her theory. True enough.

- Cowden/Franklin argue that the cases cited by Chatto are distinguishable but leave the argument at a conclusion and do not discuss most of the cases that Chatto cites.

- Cowden/Franklin further argue that Chatto's authorities do not pay heed to the language of Section 38.001 because that section references a recovery of the "amount of a valid claim" and

  > [w]hile [Chatto] focuses on the term "valid claim[,"] Appellant[s] submit[] that the focus of this argument should be on the word "amount[,"] which necessarily means that the claimant is required to recover an amount of money in order to recover attorney's fees under [Section] 38.001. In the case at bar, [Chatto] did not recover an "amount of a valid claim" of damages under the contract[] and therefore is not entitled to recover[] attorney's fees under [Section] 38.001.

  Even if this argument held some sway generally, it is not persuasive under our facts. Again, Chatto's prior-breach claim entitled her to a

30

recovery in a specific amount—the portion of the fees held in the registry of the court that Cowden/Franklin claimed as their contingency fee and which were awarded to Chatto.

We overrule Cowden/Franklin's first issue.[7]

**B.     Issue Three—Cowden/Franklin's legal-sufficiency challenge to the jury's award of damages to Chatto for past mental anguish**

**1.      We hold that that there is sufficient evidence to support the jury's answer that Chatto suffered mental anguish in the past.**

As explained more fully below, the proof offered of mental anguish must establish either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. We analyze the evidence offered on this question using the guideposts set out by the supreme court. Using those guideposts, we conclude that Chatto presented some evidence of compensable mental anguish. We do not reach a causation question raised by Cowden/Franklin because the issue is not preserved for our review.

---

[7]Chatto concedes Cowden/Franklin's second issue—that a claim for breach of fiduciary duty will not support an award of attorney's fees. Our disposition of the first issue makes it unnecessary to address the second issue. *See* Tex. R. App. P. 47.1.

31

## 2. We set forth the avenues that may be used to establish that a party has suffered mental anguish and the guideposts for review of a legal-sufficiency challenge to the proof of mental anguish.

The supreme court has stated that there are two avenues to establish that a plaintiff has suffered compensable mental anguish:

> A damages award for mental anguish will survive a legal-sufficiency challenge when the record bears "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish, thus establishing a substantial disruption in the plaintiff['s] daily routine," *or* when the record demonstrates "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." Such evidence is more likely to provide the fact[]finder with adequate details about the extent of the claimant's mental anguish.

*Anderson v. Durant*, 550 S.W.3d 605, 618–19 (Tex. 2018) (footnotes omitted) (emphasis added).[8]

*Anderson* then discussed the "guideposts" that may be looked to in sorting out the question of whether the evidence that a plaintiff has experienced mental anguish is sufficient:

> Individuals experience mental anguish in myriad ways, so each case is unique. Nevertheless, reasonable guideposts appear in our jurisprudence and instruct our analysis. For example, in *Bentley v. Bunton*, [94 S.W.3d 561, 606–07 (Tex. 2002),] we found evidence that compensable mental anguish resulted from defamatory statements that the plaintiff, a judge, was corrupt, but no evidence supporting the jury's multi-million-dollar award. The plaintiff testified [that] he [had] lost time with his friends and family, spent time worrying at home, and was distressed about the

---

[8]The definition of mental anguish in the charge roughly matched the two avenues of proving mental anguish set out in *Anderson*: "'MENTAL ANGUISH' is defined as intense pain of body or mind or high degree of mental suffering involving more than mere worry, anxiety, vexation[,] or anger." *See* 550 S.W.3d at 618–19.

impact the defamatory statements had on him and his family within their community. The plaintiff's wife corroborated his testimony, testifying he lost sleep, suffered from stress, and would never be the same. Similarly, a friend testified [that] the plaintiff's demeanor had changed and [that] he had behaved "downcast," "depressed," and "sad." We held this to be legally sufficient evidence of mental anguish. . . .

Although corroborating evidence was helpful in *Bentley*, we do not require it when the plaintiff's testimony provides sufficient evidence of mental anguish. In *Service Corp. International v. Guerra*, [348 S.W.3d 221, 233 (Tex. 2011),] we found evidence supported an award of mental-anguish damages to a widow after her husband's grave had been defiled. The widow testified [that] she was anxious for years about whether her own grave would be desecrated, was afflicted with headaches, could not sleep, and suffered stress that caused burning in her stomach. She sought medical treatment for these issues and was prescribed medication for anxiety and depression. This testimony was legally sufficient evidence of compensable mental anguish, despite the widow's ability to continue volunteering, participating in church activities, and traveling.

*Id.* at 619–20 (footnotes omitted).

The supreme court had previously relied on *Guerra* to offer a contrast between evidence that constitutes some evidence to support a claim of mental anguish and that which does not:

In *Guerra*, the daughters and widow of a decedent sued a cemetery for moving the decedent's body against their wishes. [348 S.W.3d] at 226. One daughter claimed that the experience "has been the hardest thing that I have had to go through with my family and myself. I have had lots of nights that I don't sleep just thinking," that it had been "very difficult," and that she "cannot begin to express the frustration and agony we have all gone through." *Id.* at 232. She nonetheless testified that she had continued to work, participate in volunteer and other activities, and travel. *Id.* Another daughter testified that "it's not part of my life. I didn't have to accept that and I do not accept it and I won't accept it." *Id.* And the third daughter testified that "[w]e're not at peace. We're always wondering. You know, we were always wondering where our father was. It was hard to hear how this company stole our father

33

from his grave and moved him. That was hard." *Id.* (alteration in original). Other witnesses also testified that the experience was devastating for the family. *Id.* But coupled together, we held that the testimony was still not some evidence of a substantial disruption in daily routine or a high degree of mental pain and distress. *Id.* ("[G]eneralized, conclusory descriptions of how an event affected a person are insufficient evidence on which to base mental[-]anguish damages.").

The mother, on the other hand, had such severe stress that she experienced burning in her stomach, for which she sought medical treatment. *Id.* at 233. She also sought treatment for anxiety and depression, and she experienced headaches and sleeplessness. *Id.* We held that this was some evidence of mental anguish. *Id.*

*Hancock v. Variyam*, 400 S.W.3d 59, 68–69 (Tex. 2013).

### 3. We detail the evidence contained in the record of Chatto's mental anguish.

Chatto's testimony supporting her claim of mental anguish is concentrated in a few pages of the record:

Q. (BY [Chatto's trial attorney]) Have there ever been any times when you've had any thoughts, one way or another, about these lawyers, Mr. Cowden and Mr. Franklin?

. . . .

[A.] Yes, all the time. Since this lawsuit started, that's all I think about. I can't sleep. I don't understand why they are doing this. I don't understand[] because I didn't expect this. I just don't understand. I think about it a lot, yes.

Q. (BY [Chatto's trial attorney]) So would you think these are happy thoughts or less than happy thoughts?

A. They are very stressful thoughts.

Q. In thinking about this, do you find it encouraging or discouraging?

34

A. Discouraging.

. . . .

Q. (BY [Chatto's trial attorney]) What, if any impact, has this behavior, we'll call it, as evidenced in the . . . lawsuit being brought against you --

. . . .

Q. I'm [not] done yet. Regarding this lawsuit and the letter, 11, August, and everything, the behavior of the lawyers toward you, what, if any, impact has this had on your day-to-day life since 11, August, 2020?

A. Since this lawsuit has been filed, it just causes me so much stress. In the last -- in the beginning it was a little less stress, and after that, it got worse and worse. And actually, last year, when I went to my doctor for [a] physical checkup, she increased my diabetes --

. . . .

. . . I used to take one pill a day for my diabetes. Now, I take two. Last year, I started getting [a] headache just from thinking about it and what to do and how to deal with it and the stress that it caused me. I get a headache all the time, and I got a new prescription for that headache. I try not to take too many pills[] because I already take some for cholesterol. And the diabetes is a huge concern . . . because it has a lot of side effects. And now, I have to take more medication for headache[s]. I can't sleep. I probably sleep, like, three, four hours a day because I just toss and turn about what's going to happen today. Because every day, there's something going on with this case. It's not like you just file the lawsuit[,] and that's it. You wait until you go to trial. Every day there's something, some filing, some here and some -- nonstop. I just -- you know, I feel like I just want to be alone. And last month, actually, my sister came to visit me from France, and I haven't seen her since 2018. She came to stay with us for two weeks, and I should be happy that she's here visiting. I haven't seen her. But every time I went to bed, I was, like, when is she going to go home[] because I'm not enjoying her company -- not enjoying -- you know, I just don't want to talk to people. I get mad very quickly, irritated. It just -- it's a really stressful situation. It really is.

35

Q.  Do you think it will ever improve?

A.  I don't think so[] because it's getting worse as we go.  Like I said, it wasn't this bad in the beginning, but it's getting worse.  I think this will be, like, a lifetime experience.  It won't go away.  Just like with my criminal record that happened 2010, and here I am 13 years later, sitting in the court talking about it.  I already paid the price for it, but these things don't go away.  They just stay with you.

. . . .

Q.   (BY [Chatto's trial attorney]) M[r]s. Chatto, over the past couple of years, can you tell the jury whether or not you've lost some weight?

A.  I did.  I lost about 30 pounds.  And Mr. Franklin and Mr. Cowden would know that[] because they have seen before they filed this lawsuit.  It is very, very -- it affects your appetite.  It affects your sleeping.  It affects your relationship with your friends.  Anxiety anxiety [sic] level is so high, especially when you're in a situation like this.  It's just unpleasant, yeah.

Chatto acknowledged on cross-examination that she had incurred no medical expenses to treat the mental anguish she claimed that she had suffered nor did she have any records of counseling reflecting treatment for it.

Chatto's husband offered his observations about the effects of the litigation on her as being under stress, having lines appear on her face, being less happy, being more depressed and less exuberant, exhibiting demeanor changes that are present all the time, and having trouble sleeping.  On cross-examination, Chatto's husband acknowledged that she had not sought treatment from a doctor or counseling for the stress that he had observed.

36

### 4. There is some evidence that Chatto experienced compensable mental anguish.

The core question is whether this evidence is more than a scintilla of evidence of a "substantial disruption in the plaintiff['s] daily routine" or "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Anderson*, 550 S.W.3d at 618–19.[9] If we look to the

---

[9]As explained throughout, Cowden/Franklin have preserved challenges only to the legal sufficiency of the evidence. Cowden/Franklin did not preserve a factual-sufficiency challenge by filing a motion for new trial. *See* Tex. R. Civ. P. 324(b)(2) ("A point in a motion for new trial is a prerequisite to the following complaints on appeal: . . . [a] complaint of factual insufficiency of the evidence to support a jury finding[.]"). Instead, their evidentiary challenges are made in a motion for directed verdict and JNOV, which are the means to preserve a legal-sufficiency challenge. *See Lowry v. Tarbox*, 537 S.W.3d 599, 609 (Tex. App.—San Antonio 2017, pet. denied) ("[F]ollowing a jury trial, to preserve a no-evidence complaint for review, the complaint must be raised in '(1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact issue; or[] (5) a motion for new trial.'" (citing *Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821, 822 (Tex. 1985))).

Therefore, we set forth only the legal-sufficiency standard of review that will apply to many of the issues raised by Cowden/Franklin. We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged

guideposts set by the supreme court, and especially the contrast described in *Hancock*, it appears that in the very imprecise realm of measuring what evidence is sufficient, Chatto's testimony is sufficient. *See* 400 S.W.3d at 68–69. She has suffered headaches, trouble sleeping, weight loss, relationship issues, and high levels of anxiety. If looked at solely through the prism of whether this is a sufficient quantum of evidence to establish mental anguish, it is.

On the evidentiary sufficiency question, Cowden/Franklin make a number of arguments that we conclude do not undermine our holding that there is some evidence of compensable mental anguish. Their contentions are as follows:

- Chatto presented no testimony from a treating physician or counselor. As Chatto points out, such corroborating testimony is unnecessary. In the supreme court's words,

> Under this admittedly nebulous definition and the traditional standard of review, it is nevertheless clear that an award of mental[-]anguish damages will survive a legal[-] sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine. Such evidence, whether in the form of the claimants' own testimony, that of third parties, **or** that of experts, is more likely to provide the fact[]finder with adequate details to assess mental[-]anguish claims.

> *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (emphasis added in bold); *see also Anderson*, 550 S.W.3d at 619 ("Although corroborating evidence was helpful in *Bentley*, we do not require it when the plaintiff's testimony provides sufficient evidence of mental anguish.").

finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

- Cross-examination undermined Chatto's testimony because other events, such as the shoplifting charge and the divorce, had caused her mental anguish. As Chatto points out, this testimony might well enter into a factual-sufficiency analysis, but Cowden/Franklin make no factual-sufficiency challenge in their brief and did not raise the issue in the trial court; thus, the issue is waived. *See* Tex. R. Civ. P. 324(b)(2) (requiring preservation of a factual-sufficiency issue in a motion for new trial).

### 5. Cowden/Franklin's primary argument challenging Chatto's mental anguish recovery is one of causation that has not been preserved for our review.

Cowden/Franklin's core challenge to Chatto's proof of mental anguish is that it was the stress of litigation and not their actions in the prior suit that caused Chatto's stress. We will not reach this causation argument because it was not preserved.

Cowden/Franklin moved for a directed verdict and filed the JNOV. But for those motions to preserve error, the arguments raised in them must match the arguments raised on appeal. Here, the arguments raised in the JNOV and on appeal do not match.

In the context of a JNOV, *Amerjin Co. v. Ashby LLP* discussed the requirements of error preservation—that a timely objection be made, that it be specific enough to make the trial court aware of the complaint, and that the objection on appeal comport with the objection made at trial. No. 01-18-00231-CV, 2020 WL 1522823, at *11 (Tex. App.—Houston [1st Dist.] Mar. 31, 2020, pet. denied) (mem. op.); *see also* Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 268 (requiring ground for directed verdict to be specific); Tex. R. Civ. P. 301 (stating that a motion for JNOV and a motion for

39

directed verdict use the same standard).  A mismatch between the argument made in a

JNOV and the argument raised on appeal in *Amerjin* failed to preserve error:

> [W]e hold that appellants have not preserved the above portion of their first issue or their third issue for appellate review.  *See* Tex. R. App. P. 33.1(a); *see, e.g.*, *Mattar v. BBVA Compass Bank, NA*, No. 13-16-00496-CV, 2018 WL 2440382, at *11 (Tex. App.—Corpus Christi–Edinburg May 31, 2018, no pet.) (mem. op.) (complaint trial [court] erred in denying motion for JNOV not preserved[] where motion did not mention argument raised on appeal); *Scarbrough v. Purser*, No. 03-13-00025-CV, 2016 WL 7583546, at *23 (Tex. App.—Austin Dec. 30, 2016, pet. denied) (mem. op.) (argument on appeal not raised in motion for JNOV); *B & W Supply, Inc.*[ *v. Beckman*], 305 S.W.3d [10,] 20 [(Tex. App.—Houston [1st Dist.] 2009, pet. denied)] (argument in motion for JNOV differed from argument asserted on appeal); *Lee v. Lee*, 47 S.W.3d 767, 776–77 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (refusing to consider appellate complaint which differed from complaint raised in motion for JNOV that no evidence supported jury's finding); *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 725 (Tex. App.—Waco 1998, pet. denied) (appellant could not challenge trial court's refusal to grant motion for JNOV on ground when he did not first ask trial court to render JNOV on that ground).

2020 WL 1522823, at *12 (footnote omitted).

Here, Cowden/Franklin used the word "causation" in their motion for directed

verdict, but the basis for the motion was "complete lack of evidence as to medical

causation of any alleged mental[-]anguish claims, emotion[al] distress claims,

intentional infliction, emotional distress."  The same basis was raised in the JNOV to

challenge the proof of mental anguish:

> Chatto had no evidence or testimony that Cowden or Franklin [had] caused her any physical injury.  Chatto had no medical records documenting any medical treatment or psychological treatment/counseling of her complaints of mental anguish.  Chatto had no records or documents of any kind even documenting her complaints

of mental anguish. Chatto had not even seen or reported her mental anguish to any professional or religious counselor or other professional. Therefore, as a matter of law, Chatto's evidence in support of any mental[-]anguish damages completely fails to prove that Chatto suffered a "[]high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger" and that caused a "substantial disruption in [her] daily routine."

Thus, the complaints raised on causation in the trial court (no medical evidence of damages) do not match those raised on appeal (cause of mental anguish was litigation, which is not recoverable), and Cowden/Franklin have failed to preserve it for our review.[10]

We overrule Cowden/Franklin's third issue on appeal.

### C. Issue Four—Cowden/Franklin's legal-sufficiency challenge to the jury's answer that they breached their fiduciary duty as lawyers to Chatto

#### 1. When all of Cowden/Franklin's actions in representing Chatto are considered, there is legally sufficient evidence that they breached their fiduciary duty as lawyers to Chatto.

Cowden/Franklin argue in their fourth issue that the record demonstrates that their dispute with Chatto was merely a fee dispute and that there is no evidence to support the jury's finding that they breached a fiduciary duty owed by them to

---

[10]During Chatto's testimony, there was an objection: "You're not allowed to claim stress from [a] lawsuit as damages. That's well established." No issue is raised based on this objection, and the argument was not carried forward in the motion for directed verdict or the JNOV.

Chatto.[11]  Cowden/Franklin's argument draws an arbitrary line in the sand, arguing that there is no evidence that they breached a fiduciary duty to Chatto because they acted properly once the fee dispute arose.  Their brief summarizes this position as follows:

> [Cowden/Franklin] submit that the evidence in this case shows that they were never trying to "improperly benefit" from the attorney[–]client relationship[] but were, rather, trying to determine, either by agreement or through the court, the compensation that was due under the attorney[-]fee agreement.  [Cowden/Franklin] were not subordinating their interests to that of the client [sic], were not engaging in self-dealing, did not retain the proceeds from the settlement, and did not make any misrepresentations to [Chatto].  This is a breach[-]of[-]contract case involving the proper interpretation of the fee agreement[] and does not involve the breach of any fiduciary duty owed by [Cowden/Franklin] to [Chatto].  Therefore, [Cowden/Franklin] did not breach their fiduciary duty to [Chatto] as a matter of law, as this did not involve the integrity or fidelity of [Cowden/Franklin].

As discussed below, the record does not support their effort to absolve themselves by superimposing a narrow temporal focus on their relationship with Chatto.

### 2. A lawyer owes a fiduciary duty to his clients under Texas law.

It is axiomatic that attorneys owe their clients a fiduciary duty.  The basis and parameters of that duty are described as follows:

> Texas courts have long recognized that fiduciary duties are owed by an attorney to a client due to the special nature of the attorney[–]client

---

[11]Chatto argues that Cowden/Franklin are limited to a legal-sufficiency challenge because they did not preserve a factual-sufficiency challenge.  In their reply brief, they do not challenge Chatto's assertion.  Instead, they too categorize their challenge as one of legal sufficiency.  Thus, we will limit our review to legal sufficiency.

relationship. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002). As explained in *Johnson*, attorneys occupy positions of confidence towards their client and are obligated to act with "integrity and fidelity." *Id.* The relationship "contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction." *Id.* A claim that an attorney breached a fiduciary duty owed to a client focuses on whether the attorney obtained an improper benefit from representing the client. *See Kemp v. Jensen*, 329 S.W.3d 866, 871–72 (Tex. App.—Eastland 2010, pet. denied) [(op. on reh'g)] (citing *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.)). For example, an attorney may breach a fiduciary duty when the attorney benefits improperly from the attorney[–]client relationship by "subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends." *Id.* (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).

*Border Demolition & Env't, Inc. v. Pineda*, 535 S.W.3d 140, 159–60 (Tex. App.—El Paso 2017, no pet.).

Of course, not every claim against a lawyer by a client is a breach of fiduciary duty; courts are careful to follow an anti-fracturing rule to ensure that the nature of the cause of action rather than the fact that an attorney–client relationship exists dictates how a claim is categorized. *Brickley v. Reed*, No. 03-22-00453-CV, 2023 WL 2376127, at *2 (Tex. App.—Austin Mar. 7, 2023, no pet.) (mem. op.) ("Plaintiffs may not split, or 'fracture,' what are in essence legal-malpractice claims into separate claims under non-negligence theories like fraud, breach of fiduciary duty, breach of contract, or violations of the DTPA."). But on the other side of the equation, "[t]he existence of an attorney[–]client fee agreement does not automatically foreclose a client's

43

pursuit of a claim for breach of fiduciary duty." *Fleming v. Kinney*, 395 S.W.3d 917, 925 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (op. on reh'g).

Further, a lawyer cannot insulate himself from a breach-of-fiduciary claim by arguing that the client received the benefit of the bargain when a client does not complain about the result obtained. As noted by the Dallas Court of Appeals,

> Appellees argue that they did not receive an improper benefit because they earned the fees and because the Clients do not complain about the quality of the legal services or the results obtained in the underlying case. For support, they rely on cases holding that legal fees received for negligently rendered legal services, without more, are not an improper benefit that transforms a negligence claim into a fiduciary-duty claim. *See Reneker v. Offill*, No. 3:08-CV-1394-D, 2009 WL 804134, at *10 (N.D. Tex. Mar. 26, 2009) [(mem. op. & order)]; *Vara v. Williams*, No. 03-10-00861-CV, 2013 WL 1315035, at *4 n.4 (Tex. App.—Austin Mar. 28, 2013, no pet.) (mem. op.). This case, however, is distinguishable from *Reneker* and *Vara* because the Clients' fiduciary-duty claims are not founded on negligently provided legal services[] but rather on appellees' alleged failure to disclose their own alleged prior misconduct.

*Neese v. Lyon*, 479 S.W.3d 368, 388 (Tex. App.—Dallas 2015, no pet.).

### 3. We set forth how the jury charge submitted the question of breach of fiduciary duty.

The jury charge in this case altered to some extent the parameters of the fiduciary duty that is owed to a client by her lawyer as described in the cited cases. Specifically, the charge instructed the jury as follows:

> "FIDUCIARY DUTY"[:] Lawyers owe their clients a fiduciary duty. Under the law, attorneys have fiduciary duties to their clients. A fiduciary duty is a duty of utmost good faith and fair dealing, and fiduciaries must not place their own self-interest ahead of their clients.

In turn, the charge submitted identical questions with respect to both Cowden and Franklin as to whether they had breached their fiduciary duty and the standards encompassed by that duty. The question submitted with respect to Franklin stated,

> Did a breach of fiduciary duty by Franklin proximately cause harm and damage to Mrs. Chatto?
>
> NOTE THAT as Mrs. Chatto's attorney[,] Franklin owed to her a fiduciary duty. To prove that he complied with [and did not breach] his duty[,] Franklin must show and prove that:
>
> 1. [T]he transaction[s] in question [was/were] fair and equitable to Mrs. Chatto; and
>
> 2. Franklin made reasonable use of the confidence that Mrs. Chatto placed in him; and
>
> 3. Franklin acted in the utmost good faith and exercised the most scrupulous honesty toward Mrs. Chatto; and
>
> 4. Franklin placed the interests of Mrs. Chatto before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Mrs. Chatto, and did not place himself in any position where his self-interest might conflict with his obligations to her as a fiduciary; and
>
> 5. Franklin fully and fairly disclosed all important information to Mrs. Chatto concerning the transaction[s].

The jury answered "yes" as to both Cowden and Franklin.

No objections to the charge are contained in the record. Thus, we review the evidence through the prism of the charge submitted. *See Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 220–21 (Tex. 2003).

45

**4. We detail the proof that Cowden/Franklin breached their fiduciary duty to Chatto.**

Whether under the case-law standards establishing the bounds of a lawyer's fiduciary duties or the standards specified in the charge, there is evidence of a breach of fiduciary duty by Cowden/Franklin to Chatto. During the seven days of testimony, the jury heard evidence of several instances that are evidence of a breach of fiduciary duty:

- The jury heard conflicting evidence of the explanation of the Fee Agreement with Chatto's testimony that she was told that she would have to pay no more than a 20% contingency fee and had never been told as was contended by Cowden/Franklin that there would have to be an agreement about an hourly fee at the end of the litigation. The record supports the view that Cowden/Franklin told Chatto one thing to obtain her agreement for representation and then told her that the Fee Agreement bound her to a different arrangement that was more profitable to them when money was about to be in hand. Under the charge question on fiduciary duty, this is some evidence that the transaction was not fair, that the lawyers gained a personal benefit at Chatto's expense, and that all important information was not disclosed. Beyond the charge, a failure to disclose material information about a fee contract is a potential breach-of-fiduciary duty. *See Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011) ("Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized. Part of the lawyer's duty is to inform the client of all material facts." (footnotes omitted)).

- The jury also heard that Cowden/Franklin attempted to extract a larger fee from Chatto by arguing that she had acted fraudulently by concealing her full criminal history and that her fraud invalidated the Fee Agreement and its limitations on the fee. Yet, they sued her on that contract and argued strenuously at trial that the contract entitled them to the fee they sought. If the jury believed Chatto that she had made full disclosure, the jury was entitled to believe that Cowden/Franklin had

46

used deception in claiming that Chatto had not disclosed the full extent of her criminal history to obtain a personal benefit in the form of a higher fee than they knew that they were entitled to under the terms of the Fee Agreement. Again, this is some evidence that meets the criteria of a breach of fiduciary duty as set out in the charge. And this evidence would also constitute a breach of a lawyer's duties as traditionally defined. *See Wolf v. Ramirez*, 622 S.W.3d 126, 143 (Tex. App.—El Paso 2020, no pet.) ("Among [a lawyer's] additional duties . . . are the duty to act with absolute candor and honesty[] and without any concealment or deception[.]").

- The jury heard evidence that Chatto was told that she could not settle the suit against her ex-husband without the agreement of Cowden/Franklin. Franklin acknowledged at trial that this was an improper thing to say. Utilizing the charge's terms, such a deception was not "full and fair disclosure," nor an act in "scrupulous honesty," and constituted an act in which the lawyers elevated their self-interest above the client's. The statement was also a clear ethical violation. *See, e.g.*, *Lopez v. Maldonado*, No. 13-15-00042-CV, 2016 WL 8924108, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2016, no pet.) (mem. op.) (holding that provision in fee contract requiring attorney's consent to settlement violated Texas Rule of Disciplinary Conduct 1.20(a)(2) and rendered fee contract voidable.)

- The jury heard evidence that—without Chatto's authorization—Cowden/Franklin sought to negotiate with both the mediator and her ex-husband's attorney to allocate a portion of the settlement to attorney's fees or to specify what part of the settlement was for contractual damages. Both efforts were an attempt to create a larger claim for fees under the Fee Agreement for themselves. Thus, the lawyers appear to have been attempting to renegotiate the settlement terms to benefit themselves to their client's detriment and to reduce their client's recovery, apparently without their client's knowledge or at least her authorization. At a minimum, this placed the lawyers' self-interests above those of the client.

The evidence that we have cataloged is some evidence of a breach of fiduciary duty as that act is defined by the charge. The improper benefit accruing from

47

Cowden/Franklin's acts is obvious: the record supports a view that each of the acts was calculated to extract a higher fee from Chatto than the one provided by the Fee Agreement, which was represented to Chatto as requiring her to pay only a 20% contingency fee.

The examples we list above were also cataloged in Chatto's brief. The only response that Cowden/Franklin make to the catalog in their reply brief reiterates the narrow argument that they acted properly once the fee dispute arose, i.e., "[Cowden/Franklin] assert that there is no evidence that any of these factors occurred when the fee dispute arose[] and that [Cowden/Franklin] acted responsibly in depositing the proceeds of the settlement into the registry of the court." This argument again tries to superimpose an arbitrary time frame that excludes much of the conduct that supports Chatto's breach-of-fiduciary-duty claim. It offers no explanation why we should ignore the entire span of the attorney–client relationship in analyzing whether Cowden/Franklin breached their fiduciary relationship to Chatto. In essence, the argument leaves unchallenged Chatto's and our conclusion that the acts cataloged are some evidence of a breach of fiduciary duty.

We overrule Cowden/Franklin's fourth issue.

**D.** **Issue Five—Cowden/Franklin's challenge that the trial court abused its discretion by ordering a forfeiture of the contingency fee in the Fee Agreement**

    **1.** **We set forth why we conclude that the trial court did not abuse its discretion by ordering a forfeiture.**

In their fifth issue, Cowden/Franklin argue that the trial court erred by concluding that they forfeited the contingency fee provided for in the Fee Agreement.[12] Their brief combines the argument of this issue with the sixth issue discussing the need for a separate hearing on the forfeiture issue. To say the least, this makes it difficult for us to isolate the specific issue that Cowden/Franklin rely on to argue that the trial court abused its discretion by ordering the forfeiture. The best we can discern is that the argument is a variation on the one we addressed above: this case is merely a fee dispute with no evidence of a breach of fiduciary duty by the lawyers. We find this argument to be no more persuasive in the context of this issue than we did above.

    **2.** **An abuse-of-discretion standard of review applies to the trial court's forfeiture decision.**

The standard of review that applies is as follows:

We review a trial court's equitable-forfeiture determination for abuse of discretion. *See Cooper v. Campbell (Cooper I)*, No. 05-15-00340-CV, 2016 WL 4487924, at *10 (Tex. App.—Dallas Aug. 24, 2016, no pet.) (mem. op.) (citing *Burrow*[ *v. Arce*], 997 S.W.2d [229,] 243 [(Tex. 1999)]). Thus,

---

[12]We address this issue even though Chatto argues that the finding of prior breach is sufficient to support the trial court's conclusions that Cowden/Franklin are not entitled to the contingency fee. For the sake of completeness, we also address the alternative ground for the conclusion.

we "will not disturb the trial court's ruling on a claim seeking equitable relief unless it is arbitrary, unreasonable, and unsupported by guiding rules and principles." *Cooper v. Campbell/Richard T. Mullen, Inc. (Cooper II)*, No. 05-17-00878-CV, 2018 WL 5919030, at \*6 (Tex. App.—Dallas Nov. 13, 2018, pet. denied) (mem. op. on reh'g).

*Heatley v. Red Oak 86, L.P.*, 629 S.W.3d 377, 388–89 (Tex. App.—Dallas 2020, no pet.).

### 3. We explain the process to be followed by a trial court to determine whether a fee should be forfeited.

A trial court's equitable powers include the ability to order a forfeiture as a remedy for a breach of fiduciary duty. Specifically,

> [c]ourts may fashion equitable remedies such as disgorgement and forfeiture to remedy a breach of a fiduciary duty. *Cooper [I]*, 2016 WL 4487924, at \*10 . . . ([first] citing *ERI Consulting Eng'r[s], Inc. v. Swinnea*, 318 S.W.3d 867, 874, 873–75 (Tex. 2010); [then citing] *Burrow* . . . , 997 S.W.2d [at 239–40 & n.36]; [and then citing] *Dernick Res[.], Inc. v. Wilstein*, 471 S.W.3d 468, 482 (Tex. App.—Houston [1st Dist.] 2015, pet. denied)). Disgorgement is an equitable forfeiture of benefits wrongfully obtained. *Id.* ([first] citing *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) (orig. proceeding); [and then citing] *Swinnea v. ERI Consulting Eng'r[s], Inc.*, 481 S.W.3d 747, 752 (Tex. App.—Tyler 2016, no pet.)). A party may be required to forfeit benefits when a person rendering services to another in a relationship of trust breaches that trust. *See . . . Longview Energy Co.*, 464 S.W.3d [at] 361.

*Cruz v. Ghani*, No. 05-17-00566-CV, 2018 WL 6566642, at \*22 (Tex. App.—Dallas Dec. 13, 2018, pets. denied) (mem. op. on reh'g).

The purpose served by an equitable forfeiture goes beyond compensating a party for a loss and instead has a deterrent effect:

> "We have said that such equitable forfeiture 'is not mainly compensatory . . . nor is it mainly punitive' and 'cannot . . . be measured by . . . actual

damages.'" [*Longview*, 464 S.W.3d at 361] (quoting *Burrow*, 997 S.W.2d at 240). Disgorgement is compensatory in the same sense attorney fees, interest, and costs are, but it is not damages. *Id.* As a result, equitable forfeiture is distinguishable from an award of actual damages incurred as a result of a breach of fiduciary duty. *Cooper*[ *I*], 2016 WL 4487924, at *10 ([first] citing *Burrow*, 997 S.W.2d at 240; [then citing] *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 905 (Tex. App.—Dallas 2014, pet. denied); [and then citing] *Swinnea*, 481 S.W.3d at 753). A claimant need not prove actual damages to succeed on a claim for forfeiture because they address different wrongs. *Id.* ([first] citing *Burrow*, 997 S.W.2d at 240; [and then citing] *Swinnea*, 481 S.W.3d at 753). In addition to serving as a deterrent, forfeiture can serve as restitution to a principal who did not receive the benefit of the bargain due to his agent's breach of fiduciary duty. *Id.* [(citations omitted)]. However, forfeiture is not justified in every instance in which a fiduciary violates a legal duty because some violations are inadvertent or do not significantly harm the principal. *Cooper*, 2016 WL 4487924, at *10 ([first] citing *Burrow*, 997 S.W.2d at 241; [then citing] *Dernick*, 471 S.W.3d at 482; [and then citing] *Miller*[ *v. Kennedy & Minshew, Pro. Corp.*], 142 S.W.3d [325,] 338[ (Tex. App.—Fort Worth 2003, pet. denied]).

*Id.* And "[w]hen the agency relationship is that of an attorney and client, 'concern for the integrity of attorney[–]client relationships is at the heart of the fee[-]forfeiture remedy." *Estate of Nunu*, 542 S.W.3d 67, 76 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

The criteria for making the forfeiture determination and the division of labor between the factfinder and the trial court in this process is described as follows:

Whether a forfeiture should be imposed must be determined by the trial court based on the equity of the circumstances. *Cooper*, 2016 WL 4487924, at *10 ([first] citing *Burrow*, 997 S.W.2d at 245; [then citing] *Swinnea*, 481 S.W.3d at 753; [and then citing] *Dernick*, 471 S.W.3d at 482). However, certain matters may present fact issues for the jury to decide, such as whether or when the alleged misconduct occurred, the fiduciary's mental state and culpability, the value of the fiduciary's services, and the existence and amount of harm to the principal. *Id.*

51

([first] citing *Dernick*, 471 S.W.3d at 482; [and then citing] *Miller*, 142 S.W.3d at 338). Once the factual disputes have been resolved, the trial court must determine[] (1) whether the fiduciary's conduct was a "clear and serious" breach of duty to the principal; (2) whether any monetary sum should be forfeited; and (3) if so, what the amount should be. *Id.* [(citations omitted)].

*Cruz*, 2018 WL 6566642, at *22.

As highlighted below, Cowden/Franklin take the position that their conduct was not a "clear and serious" breach of their duties. In analyzing this question, we will apply the following guidance:

A ["]clear["] violation occurs ["]if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful.["] *Burrow*, 997 S.W.2d at 241 (quoting Restatement (Third) of the Law Governing Lawyers § 49, cmt. d (Proposed Final Draft No. 1, 1996)). The "serious" requirement takes into consideration ["]the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.["] *Id.* at 243; *see also* Restatement (Third) of the Law Governing Lawyers § 49.

*Wythe II Corp. v. Stone*, 342 S.W.3d 96, 104 (Tex. App.—Beaumont 2011, pet. denied).

### 4. We set forth Cowden/Franklin's contention regarding why the trial court abused its discretion by ordering a forfeiture.

In our effort to isolate Cowden/Franklin's contentions about why a forfeiture was an abuse of discretion, we highlight two arguments buried in their brief:

[First, Cowden/Franklin] submit that there is no evidence that they received a "secret gain or benefit" or that their actions were disloyal in any manner to [Chatto]. Certainly, the evidence in this case fails to establish that any breach of fiduciary duty by [Cowden/Franklin] was clear and serious. There was no testimony that [Chatto] was dissatisfied

52

with [Cowden/Franklin's] representation of her interest in the underlying case. The dispute over fees arose thereafter. . . .

. . . .

[Second, i]n the case at bar, [Cowden/Franklin] contend that the evidence was legally and factually insufficient to establish that [their] breach of fiduciary duty, if any, was "clear and serious" for the court to consider the forfeiture of fees, and no hearing was requested or held for the trial court to make that determination. Specifically, as stated above, the evidence was that this was a contract dispute involving the interpretation of the attorney's fee contract. [Cowden/Franklin] submit that they acted responsibly and within their fiduciary duty in attempting to resolve the issue with [Chatto] and that, when the issue could not be resolved, this suit was filed and the monies were placed in the [r]egistry of the [c]ourt. [Cowden/Franklin] submit that this conduct is far from a "clear and serious" violation of fiduciary duty required as set forth in *Burrow*, which defines a violation as "clear and serious breach as a violation when a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful."

### 5. The trial court did not abuse its discretion by ordering forfeiture.

Cowden/Franklin's arguments repeat the ones raised on the question of whether there is sufficient evidence to support a finding of breach of fiduciary duty. Cowden/Franklin advocate for a line of demarcation in their relationship with Chatto that excludes anything that occurred before the fee dispute arose and then argue that once this line was established, their conduct beyond that line was appropriate.

Again, this effort fails by ignoring whether Cowden/Franklin's acts were a bait and switch—telling Chatto that the Fee Agreement meant one thing and then changing tunes when the terms of the Fee Agreement were not advantageous to them.

The same holds true with the evidence supporting a finding that the lawyers misrepresented Chatto's disclosure of her criminal history as leverage to obtain the fee that they wanted but had not documented in the Fee Agreement and to use the alleged failure to disclose as a basis to abrogate the Fee Agreement that they had drafted and had convinced Chatto to sign. Nor does this address Chatto's testimony that she was told that she could not settle the case without the agreement of the lawyers—a representation that Franklin agreed would be improper. The argument does not acknowledge what appears to be a surreptitious effort to alter the settlement offer by allocating the settlement funds to the advantage of the lawyers without the authorization of the client—an act that would reduce the client's recovery and increase the lawyers' fees.

It was within the trial court's discretion to conclude that Cowden/Franklin's acts were a clear violation of the duties of their attorney–client relationship with Chatto. It is difficult to argue that any lawyer would be "unclear" that it is improper to represent a fee agreement means one thing to obtain the client's signature and then claim that the fee agreement means something different when it does not generate the fee that the lawyer wants. The same holds true of Cowden/Franklin's claim that the Fee Agreement is void because a fact was not disclosed when the record supports a finding that the claim of a lack of disclosure was false. It is equally true that Cowden/Franklin's surreptitious attempt to renegotiate a settlement offer to benefit themselves over the client is improper. Finally, it is clear that lawyers cannot

misrepresent that they control acceptance of a settlement and force a client to do her own research to discover that the lawyers do not have that power, especially when one of the lawyers acknowledges that such a statement is never proper.

It was also within the trial court's discretion to conclude that the violations were "serious." The record supports a view that the breaches of duty were grave, timed to wrongfully increase a fee, and willful. Years after the settlement, presumably, Chatto will receive its proceeds. Arguably, a client unlike Chatto who did not stand her ground or protect herself by doing her own research would have accepted Cowden/Franklin's representations that they controlled the settlement decision. Even if one assumes that Chatto did not suffer actual harm because she eventually received the settlement funds, the lawyers' actions threatened to cause her harm. The facts support the trial court's exercise of its discretion to order forfeiture for the purpose of protecting the integrity of the profession by ensuring that Cowden/Franklin's conduct is not rewarded. Resolving Cowden/Franklin's narrow challenge to the forfeiture, we conclude that the trial court did not abuse its discretion by ordering that remedy.[13]

We overrule Cowden/Franklin's fifth issue.

---

[13]In their reply brief, Cowden/Franklin challenge Chatto's argument that they waived their complaint about failing to request findings of fact and conclusions of law on the forfeiture issue. We conclude that the trial court acted within its discretion in ordering forfeiture of the fee without having to address Chatto's waiver argument. *See* Tex. R. App. P. 47.1.

**E.** **Issue Six—Cowden/Franklin's contention that the trial court erred by failing to conduct an oral hearing before ordering a forfeiture**

**1.** **We conclude that under the circumstances below, the trial court did not err by not conducting an oral hearing before ordering a forfeiture.**

In their sixth issue, Cowden/Franklin argue that Chatto waived her claim that they should forfeit the contingency fee because she did not request a hearing on that claim. We do not reach the question regarding whether an oral hearing might ever be required on a fee-forfeiture request. Instead, we hold that the record before us does not establish error in failing to conduct the oral hearing for which Cowden/Franklin argue.

**2.** **We set forth how Cowden/Franklin presented their challenge to the trial court's judgment that they forfeited the contingency fee.**

No one disputes that Chatto pleaded that Cowden/Franklin should forfeit the contingency fee. As noted, the trial court signed an initial judgment that both forfeited the contingency fee and found that Cowden/Franklin had filed suit in bad faith. Cowden/Franklin then sought to reform the judgment by filing their JNOV, which requested that the trial court withdraw its conclusion that they forfeit the contingency fee and withdraw its finding that their suit against Chatto was brought in bad faith. The JNOV offered a detailed six-page argument regarding why forfeiture was not an appropriate remedy; the headings in the motion summarized the challenges that they raised as follows:

- No "Clear" Violation of Fiduciary Duty;

- No Wil[l]ful Violation of Fiduciary Duty;

- Any Timing Of Any Fiduciary Breach Was After All Lawyer Services Were Performed;

- No Effect Of The Value Of The Attorneys['] Work For The Client;

- Any Other Threatened Or Actual Harm To The Client; and

- Fee Forfeiture In This Lawsuit Will Not Protect Any Public Interest In The Attorney[–]Client Relationship

Cowden/Franklin never argued in the JNOV that the trial court had to conduct an oral hearing on the forfeiture issue or referenced evidence that needed to be heard that was not already in the existing trial record. Indeed, a later pleading filed by Cowden/Franklin argued that the trial court could not enter a sanction for a bad-faith filing without a hearing being held but made no mention of the need for a hearing on the forfeiture issue. The trial court granted the JNOV to the extent that it removed the bad-faith finding. The order partially granting the JNOV recites that it was heard by Zoom, but we have no record of the hearing. In their brief, Cowden/Franklin concede that there was a hearing of some sort.

> **3. We set forth our reasons for holding that, in the unique circumstances below, the trial court did not err by failing to hold an oral hearing on the forfeiture question.**

A host of reasons support our holding that the trial court's failure to hold an oral hearing before ordering forfeiture was not error. Specifically, Cowden/Franklin

never (1) cite authority mandating an oral hearing on the forfeiture question; (2) explain what additional testimony—beyond what was already in the trial record—should have been heard, which factual questions predicate to a forfeiture determination remained unresolved, or how the motion they filed triggered the need for a hearing; (3) explain how they were deprived of the opportunity to present their arguments to the trial court that a forfeiture should not be ordered; or (4) explain why they did not waive their claim of error by failing to alert the trial court and Chatto to their claimed need for a hearing.

Cowden/Franklin cite no authority requiring a hearing before a forfeiture order may be entered. Instead, they cite the supreme court's opinion in *Burrow* itemizing the factors that we have already outlined that must be considered before a forfeiture may be ordered. *See* 997 S.W.2d at 241, 246. Of course, this argument begs the question of whether the trial court must conduct an oral hearing to consider these factors.

Cowden/Franklin do not tell us—nor did they tell the trial court—what testimony it should have heard on the forfeiture question. Again, the trial court had a thousand-page record of seven days of testimony before it and jury findings of a breach of fiduciary duty. The matter had already been amply developed.

As explained above, any factual issues that must be resolved in the question of forfeiture are to be resolved by the factfinder before the trial court makes an equitable decision on the question of forfeiture. *Cruz*, 2018 WL 6566642, at *22 (stating that "certain matters may present fact issues for the jury to decide, such as whether or

58

when the alleged misconduct occurred, the fiduciary's mental state and culpability, the value of the fiduciary's services, and the existence and amount of harm to the principal"). How this scheme envisions the creation of another factual record when the trial court makes its equitable determination is left unexplained by Cowden/Franklin. Instead, it appears that cases analyzing whether a trial court abused its discretion by ordering a forfeiture routinely analyze the trial record to decide the question. *See Diakiw v. Stites Mgmt., L.L.C.*, 693 S.W.3d 582, 597–601 (Tex. App.—Houston [14th Dist.] Nov. 21, 2023, pet. denied).

If there were predicate factual questions on the forfeiture issue that should have been resolved but had not been, Cowden/Franklin waived their right to those determinations. If questions on these issues are not submitted or an objection not made to a defect in the question submitting them, a party waives error that a factual determination on the predicate *Burrow* factors should have been made. *See Diakiw*, 693 S.W.3d at 596 (stating that "[a]ppellants did not tender a question related to equitable relief, specifically addressing the *Burrow* factors," nor did they "object to the lack of such a question," and holding that "we cannot reverse in their favor, as parties who failed to object to the absence of a jury question or to submit one have waived that error"); *Heatley*, 629 S.W.3d at 390 (holding that parties who failed to object to jury question waived error for "addressing the level of intent with which they breached their fiduciary duties or specifically addressing any other *Burrow* factor").

Thus, Cowden/Franklin preserved no claim of error that there were factual questions left for resolution for which a record was needed.

The necessity for an oral hearing is usually triggered when oral testimony is needed to resolve a question before the trial court; and again, Cowden/Franklin never explain how that trigger was pulled by the type of motion that they filed or why there was a need for oral testimony. *Cf. Martin v. Martin, Martin & Richards, Inc.*, 989 S.W.2d 357, 359 (Tex. 1998) (concluding that summary-judgment rule requiring hearing did not mandate oral hearing because no oral testimony could be adduced at hearing); *Garcia v. Semler*, 663 S.W.3d 270, 278 (Tex. App.—Dallas 2022, no pet.) (applying the principle of *Martin*—that oral testimony could not be adduced at a TCPA dismissal hearing—and stating that "[b]ecause we conclude that neither the express language nor the context of the TCPA . . . requires an oral hearing on the merits of a TCPA motion to dismiss, we conclude that a TCPA nonmovant is not entitled to an oral hearing on the merits of a TCPA motion").

In addition, Cowden/Franklin put the issue of the propriety of the forfeiture before the trial court via a combined JNOV and motion to modify. But neither type of motion requires the trial court to conduct an oral hearing. *See Smitherman v. Comm'n for Law. Discipline*, 463 S.W.3d 97, 103 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("We likewise reject the argument that the trial court's judgment is void because [the trial court] did not conduct an oral hearing on the motion for judgment notwithstanding the verdict[] because [appellant] was not entitled to an oral hearing

60

on the motion." (citing Tex. R. Civ. P. 301)); Tex. R. Civ. P. 329b(c) (allowing motion to modify to be overruled by operation of law).

Instead, Cowden/Franklin rely on an analogy to a sanction hearing to argue that the principle governing the need for a hearing before sanctions are imposed should apply to a trial court's forfeiture determination. Their argument is as follows:

> [Cowden/Franklin] submit that the court's imposition of a fee forfeiture is analogous in many ways to the court's consideration of a bad[-]faith allegation under . . . Rule 13 of the Texas Rules of Civil Procedure. A contention that a suit that is filed in bad faith is governed by Tex. Civ. Prac. and Rem. Code [Ann. Chapter] 10 and by Texas Rule[] of Civil Procedure . . . 13. Both of these statutes require the trial court to provide notice and hold an evidentiary hearing "to make the necessary factual determinations about the motives and credibility of the person filing the groundless petition." *Parker v. Walton*, 233 S.W.3d 535, 539–[]40[ (Tex. App.—Houston [14th Dist.] 2007, no pet.)]. Under both of these statutes, the trial court is required to hold an evidentiary hearing. [Cowden/Franklin] submit that the reason for requiring a hearing under both Chapter 10 and Rule 13 is self-evident, [i.e.,] to allow both sides an equal opportunity to present evidence and make arguments in support of their position.

The analogy is inapt because again, the trial court had a final record and jury findings to rely on.

At bottom, Cowden/Franklin had an adequate opportunity to challenge the trial court's forfeiture conclusion based on the record that the trial court had before it when it made the forfeiture decision. A case dealing with whether a party received due process before a forfeiture was ordered supports the conclusion that Cowden/Franklin had an adequate opportunity to be heard on the question of forfeiture. The Eastland Court of Appeals dealt with what the due-process

requirements are before a lawyer may be ordered to forfeit a fee; the Eastland court's holding does not require a hearing to present testimony to meet the requirements of due process. *See Elliot v. Hollingshead*, 327 S.W.3d 824, 836–38 (Tex. App.—Eastland 2010, no pet.). *Elliot* held that a party must have the opportunity to present his arguments on the forfeiture question—an opportunity that Cowden/Franklin had below.

*Elliot* dealt with an order of forfeiture when there had been no pleading for a forfeiture or no trial had occurred. *Id.* The Eastland Court of Appeals held that the requirements of due process in that circumstance required "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 837. That standard was not met in *Elliot*: "Because the trial court's judgment granting fee forfeiture [was] not supported by the pleadings, it [was] erroneous. [Appellant] did not receive notice of a fee[-]forfeiture claim, and he was denied an opportunity to be heard on such a claim." *Id.* at 837–38 (citation omitted). In this case, the forfeiture claim was pleaded, a trial was conducted, and jury findings of breach of fiduciary duty were obtained; Cowden/Franklin were then able to make a meaningful presentation of their arguments to the trial court. Though the issue arose in the unconventional setting of a challenge to a judgment of forfeiture that had already been signed, nothing in the record indicates that the opportunity Cowden/Franklin had to present their arguments was impaired by the lack of an oral hearing. To the contrary, the record

shows that the trial court held a hearing on the JNOV and actually granted a portion of the motion by issuing a new judgment that removed the bad-faith finding.

Finally, we do not know what would have occurred had Cowden/Franklin requested a hearing or objected to a lack of hearing on the forfeiture issue. As noted, they filed a pleading specifically noting that a bad-faith finding could not be made without a hearing but made no mention of the need for a hearing on the forfeiture issue. The JNOV made no mention of any additional evidence that the trial court needed to hear and relied on the trial record already developed, and when Cowden/Franklin indicated that a hearing was needed, it was not on the forfeiture claim but on a different issue. It was never communicated to the trial court or to Chatto that it was error not to hold a hearing on the forfeiture issue. Cowden/Franklin now try to capitalize on the murkiness that they created in the record by arguing that both the trial court and Chatto were obliged to spontaneously schedule a hearing without any indication on Cowden/Franklin's part that the circumstances required a hearing or that they desired the trial court to hold one. Thus, any claim of error is waived. *See* Tex. R. App. P. 33.1(a); *Birmingham-Queen v. Whitmire*, No. 04-05-00646-CV, 2006 WL 1539587, at *2 (Tex. App.—San Antonio June 7, 2006, no pet.) (mem. op.) (holding that party waived complaint of trial court's failure to conduct a hearing on a summary-judgment motion by failing to request a hearing or object to the lack of a hearing).

We overrule Cowden/Franklin's sixth issue.

## IV. Conclusion

Having overruled Cowden/Franklin's first, third, fourth, fifth, and sixth issues, which are dispositive of this appeal, we affirm the trial court's amended final judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: October 3, 2024